Virginia A. Smith and Estate of Gerald H. Smith, Virginia A. Smith, Arthur Z. Gray and Arthur P. Lawler, Executors v. Commissioner.
Smith v. Commissioner
Docket No. 60632.
United States Tax Court
T.C. Memo 1958-123; 1958 Tax Ct. Memo LEXIS 98; 17 T.C.M. (CCH) 656; T.C.M. (RIA) 58123; June 30, 1958
*98 Held, that two debts in respect of which decedent incurred bad debt losses in 1946 and 1948 were "non-business debts" within the meaning of section 23(k)(4) of the 1939 Code, and that such losses are deductible only under said section. Decedent was not, at the time when said losses were incurred, engaged in a business of "fostering new enterprises." Robert J. Casey, Esq., for the petitioners. John M. Doukas, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in income tax, as follows: Taxable
Year
Deficiency
1946
Estate of Gerald H. Smith,
Deceased
$ 732.73
1947
Estate of Gerald H. Smith,
Deceased
39,493.87
1948
Virginia A. Smith and Estate
of Gerald H. Smith
10,470.56
The sole issue for decision is whether two bad debt losses, incurred by the decedent Gerald H. Smith in 1946 and 1948, respectively, were proximately related to or incurred in a trade or business operated by him, so as to be deductible in full under section 23(k)(1) of the 1939 Code; or whether such losses were incurred in respect of "non-business debts" within the meaning of *99 section 23(k)(4), so as to be deductible only as short-term capital losses. The relevant provisions of the above-mentioned statutes are set forth in the margin. [1]
Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by reference. *100 Petitioner Virginia A. Smith is the widow of Gerald H. Smith (hereinafter called the "decedent"), who died on June 18, 1955. Said widow, together with Arthur Z. Gray and Arthur P. Lawler, are the duly appointed executors of the decedent's will. The decedent filed individual income tax returns for the years 1946 and 1947 with the collector of internal revenue for the third district of New York; and he and his wife filed a joint income tax return for the year 1948 with the same collector. The decedent, during all years from the time he left college in 1936 until his death in 1955, except for one academic year in about 1937 when he attended law school, had been associated with the magazine publishing house of Street & Smith Publications, Inc., which had its principal place of business in New York City. This corporation had operated for about one hundred years; and petitioner's father who died in 1934, had been a principal stockholder and executive thereof. In 1939, decedent became the controlling stockholder of said corporation, and thereafter held more than 60 per cent of the outstanding shares of capital stock. In 1946 and 1947 he served as vicepresident of the corporation; and *101 in 1948 he became the president, and continued to serve in that capacity until his death. Most of his income during all years here involved consisted of the salary, director's fees and dividends received from said corporation. He worked at the corporation's offices, full time, for about 8 hours per day. Decedent, from time to time during or proximate to the years here involved, invested in various enterprises, and made loans of money to friends and others. That portion of such transactions, in respect of which no separate specific issue is here presented, include the following: "In about 1941, decedent as a sole proprietor subdivided and developed a 135-acre tract of land located on Long Island, New York, which he had inherited from his father. This development was called Ormond Park Subdivision. He there installed extensive improvements; built a model home; and in 1945, employed a real estate development corporation to further develop the property and handle the sale of lots. His expenditures in connection with the subdivision were more than $200,000. The project was still being actively operated for him during the taxable years here involved. "Between December 1945 and June *102 1946, decedent advanced approximately ten thousand dollars to a man named Charles Moran. Moran had previously been associated with Street & Smith as one of its editors; and he planned to write a biography of decedent's father, and a history of Street & Smith. Decedent advanced said sum with the understanding that he would share in the proceeds from Moran's book if and when it were published and proved successful. Moran never published the book; but a similar book was published by another author, after decedent's death. There is no evidence as to whether the advances were repaid. "In 1946, decedent loaned $19,500 to a man named Younglove who, with a group of other persons, were interested in developing a vacation resort and clubhouse on Pike Lake in Wisconsin. Decedent's father-in-law had a summer home at said lake, where decedent occasionally visited; and he was interested in the project. The loan was secured by a mortgage, and was made at a time when there was danger that the property might be sold for taxes. There is no evidence that decedent took any active part in the development program, or as to whether his loan was ever repaid. "In 1946, decedent loaned $12,000 to a man *103 named Chamberlain who was employed by a corporation. There is no evidence that Chamberlain was engaged in any business of his own, or that decedent ever participated in any business affairs of Chamberlain. Also, there is no evidence as to whether said loan was repaid. "In July 1946, decedent loaned $10,000 at 4 1/2 per cent interest, to The Harris School, which was located somewhere in the midwest. Decedent never participated in the management of the school; and there is no evidence as to whether the loan was repaid. "In December 1946, decedent loaned $3,000 to his friend, Eddie Condon, who was a jazz musician. Condon was in trouble with his night club at the time. The loan was later repaid. There is no evidence that decedent ever participated in Condon's business. "In June 1949, decedent discussed with a man named Richard Coogan, the possibility of developing a radio and television department for Street & Smith, and producing a television program based on literary material owned by said corporation. After consideration was given to the high costs and risks of the proposed program, it was abandoned. There is no evidence of any investment or loan having been made by decedent in *104 connection with this matter. "In January 1950, which was subsequent to all taxable years here involved, decedent advanced an unspecified amount of money to a man named Jerry O'Brien, who was a radio sports commentator. O'Brien desired to create a radio sport show which he thought would stimulate the sale of sports magazines published by Street & Smith. Such a show was started in Providence, Rhode Island; but O'Brien found that he could not utilize the Street & Smith publications. Decedent then lost interest in the project. There is no evidence as to whether the advances made to O'Brien were repaid." Re: Loans to Hill Advertising, Inc. One of decedent's transactions which is here directly involved is a loan of money to Hill Advertising, Inc. In about 1943 a man named Weston Hill who had been engaged in the advertising business for several years, decided to form his own advertising agency which would employ certain new advertising techniques. He had $10,000 to invest in the business, but more money was required. At about that time, Hill was introduced to decedent by Hill's secretary, Kay Long; and at a luncheon meeting, Hill told decedent of his plans. Decedent was interested, *105 and asked Hill for an opportunity to become a partner in the venture; but he later decided not to participate directly, because of possible embarrassment to the firm of Street & Smith. In 1943, Hill organized a New York corporation, under the name of Hill Advertising, Inc. All of the original capital of $10,000 was supplied by Hill; and he, his wife and his accountant were the stockholders. Shortly after operations began, the corporation's funds were exhausted. Decedent then told Hill that he would make loans for the business, from time to time as money was needed; and he stated that if, in the future, he should retire from his position at Street & Smith where he was not too well satisfied, he would become associated with Hill's corporation as a stockholder and officer. During the period from May to December 1943, decedent advanced to Hill Advertising, Inc., the sum of $37,002.65. These advances were evidenced by promissory notes which were signed by Hill personally; but it was understood that such notes would be obligations of the corporation. The notes bore interest, and were not subordinated to other corporate obligations. Decedent did not participate in any of the corporation's *106 affairs. In June 1945, Hill wrote a letter to decedent, in which he apologized for being out of touch with decedent for such a long time; made optimistic statements regarding the corporation's progress; and expressed the hope that, beginning in the coming fall, he would be able to start repayment of the loans on a monthly basis. In November 1946, Hill Advertising, Inc. was adjudicated bankrupt. The judgment of bankruptcy discharged the debt of the corporation to the decedent; and the notes executed by Hill were never repaid. Decedent, in his 1947 income tax return, claimed a business bad debt deduction of $36,000 in respect of said loans. The respondent, in his notice of deficiency, disallowed such business deduction; but he did allow a non-business bad debt deduction in respect of the indebtedness, for the year 1946 and in the amount of $37,002.65. The parties agree that the loss was incurred in 1946. Re: Loans to Brooklyn Professional Football Club, Inc. The other transaction of decedent which is here directly involved, pertains to loans made by him to Brooklyn Professional Football Club, Inc. In late 1945, the sports editor of a Chicago newspaper contacted decedent and *107 discussed plans for the formation of a new professional football league to be called the All America Football Conference, which was to have teams in several cities, including one in Brooklyn. Thereafter in said year, decedent and a man named William Cox organized the Brooklyn Professional Football Club, Inc. (hereinafter called the Brooklyn Club), which was a New York corporation franchised to represent Brooklyn in the new league. Decedent and Cox were the sole and equal stockholders; and each contributed $62,500 for the capital stock. Decedent was elected president of the Brooklyn Club upon its organization; and he served in such capacity until his resignation on May 6, 1948. He at no time received any salary from the Club. He had general supervision over the Club's financial affairs; took an active part in the handling of various corporate or business problems; and participated in the selection of a coach, and in matters pertaining to players. He also visited the Club's training camp one year; attended many of the games; and from time to time attended meetings with the coach, general manager, and other Club officials. The All America Football Conference did not prosper; and the *108 Brooklyn Club experienced a shortage of operating capital. Cox therefore loaned the Club $51,800; and decedent, between October 1946 and December 1947, loaned it a total of $227,500. These loans of decedent were evidenced by promissory notes of the Club, which bore interest at 4 per cent per annum and were not subordinated to other corporate obligations. On January 26, 1948, decedent sold all his shares of stock in the Brooklyn Club for $50,000; and on January 30, 1948, he received a payment of $2,500 on the abovementioned $227,500 of promissory notes. None of the balance of the indebtedness represented by said notes was ever repaid. The decedent, in the 1948 joint income tax return filed by him and his wife, claimed a business bad debt deduction of $224,500 in respect of said unpaid indebtedness of the Brooklyn Club. The respondent, in his notice of deficiency, disallowed such deduction; but he allowed instead, the entire unpaid balance of said indebtedness in the amount of $225,000, as a non-business bad debt for the year 1948. Neither the loss which decedent incurred in the year 1946 in respect of his loans to Hill Advertising, Inc., nor the loss which he incurred in 1948 *109 in respect of his loans to Brooklyn Professional Football Club, Inc. was proximately related to or incurred in any trade or business of the decedent. Opinion Petitioners contend that decedent's various investment and loan transactions above described, considered together, constituted a business of "fostering new enterprises"; and that the decedent was engaged in such business at the time when the losses with respect to the two debts here involved were incurred. Despite the difference in phraseology employed, such contention is substantially equivalent to the one frequently advanced, that a taxpayer was engaged in a business of promoting, financing, operating, and making loans to business enterprises. See, for example, ; ; and , reversing . This Court, in , affirmed per curiam (C.A. 3) , gave consideration to a similar contention; and we there said: "The authority contained in * * * [the so-called 'promoter' *110 cases] is applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves. * * *" To the same effect, see , affirmed (C.A. 4, March 6, 1958) ; , affirmed (C.A. 10) ; and . See also the decision of the Court of Appeals for the Second Circuit in . It is well settled that whether a particular loss or expense is incurred in a taxpayer's trade or business is a question of fact, to be determined from the facts and surrounding circumstances of the particular case. ; In the instant case, there can be no question that the principal business of the decedent, Gerald H. Smith, was that of an executive of Street & Smith Publications, *111 Inc. That business occupied practically his full time, and was the source of the great bulk of his income. It is true that the Ormond Park Subdivision development was another, part-time business; but it was his own venture as a real estate operator, and did not involve the "fostering [of] new enterprises" operated by other persons. Most of the other transactions reviewed in our Findings of Fact represented nothing more than the making of casual loans to personal friends and others, in connection with which decedent took no part in the conduct or operation of the debtor's business. The loans made by decedent to the Brooklyn Professional Football Club were incident to providing financial assistance to a corporation of which the decedent was one of the two equal stockholders, and in which corporation he had an equity investment, exclusive of the loans, in the amount of $62,500. These various transactions were not related one to another, either in character or in point of time; for the most part they did not consume any substantial amount of decedent's working time; and they did not provide him with any income during the taxable years involved. After seeing and hearing all the witnesses, *112 and after considering and weighing all the evidence, it is our opinion that the two bad debt losses here involved were not proximately related to or incurred in any trade or business owned or operated by the decedent. We hold that the bad debts in respect of which such losses were suffered, were "nonbusiness debts" within the meaning of section 23(k)(4) of the 1939 Code; and we decide the issue here presented in favor of the respondent. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt * * * other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩